UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MUFTI ABDUL EL-MALIK BEY ALI a/k/a FRANCIS LEE SMITH-BEY, ) ) ) Plaintiff, ) ) v. ) ) MATT PETERSON, ) DREW LIEBEL, ) ANDREW COLE, ) ) Defendants. ) | No. 1:17-cv-01571-JPH-MJD |

**REPORT AND RECOMMENDATION**

On April 30, 2019, the Court issued an order granting Plaintiff Mufti Abdul El-Malik Bey Ali preliminary injunctive relief. *See* dkt. 67. Ten days later, Mr. Abdul filed a motion indicating that the defendants took several actions to prevent him from exercising the rights afforded by the injunction. *See* dkt. 71.

On May 13, 2019, the Court requested that the Magistrate Judge issue a report and recommendation on the disposition of Mr. Abdul's motion. Dkt. 72. To that end, the Magistrate Judge has sought to determine whether it is appropriate for the Court to exercise its contempt power to enforce the April 30 injunction.

After hearing testimony and considering the parties' filings, the Magistrate Judge has serious concerns about actions taken by the defendants and their colleagues after the injunction was enacted. The record makes clear that the defendants and their colleagues took actions against Mr. Abdul that were contrary to Indiana Department of Correction (IDOC) policies, and it suggests

that they violated Mr. Abdul's rights and retaliated against him because of his participation in this case.

Despite this evidence and the strong suspicion it supports, the Court finds no legal basis to recommend contempt sanctions at this time. Nevertheless, the Court will use this Report to make its misgivings about the defendants' conduct clear in an effort to avoid similar complications as this litigation continues.

### I. Factual Background

The Court's injunction created a mechanism for Mr. Abdul to purchase food and materials to use in observing the Muslim holy month of Ramadan, which this year ran from May 5 through June 4. Specifically, the Court directed:

> Mr. Abdul shall file copies of such purchase requests with the Court. Defendants Peterson and Liebel shall have two business days from the filing of each request to either (a) file notice that either the order has been placed with the appropriate vendor, or (b) show cause why the request does not fall within the scope of this order and need not be fulfilled.

Dkt. 67 at § IV.

This mechanism clearly did not produce the result the Court intended. Mr. Abdul's first (and, to the Magistrate Judge's knowledge, his only) order was not transmitted to the vendor until May 20—halfway through Ramadan. Moreover, on May 3, Defendant Peterson wrote a conduct report recommending that Mr. Abdul be charged with a disciplinary violation. As a result of that report, Mr. Abdul was confined to prehearing restrictive status housing (PRSH) from May 9–22, 2019, during which time he was denied access to numerous religious articles he already owned and possessed in his general population cell. The Magistrate Judge's hearing on May 21 explored the reasons for the delay in placing Mr. Abdul's order and the reasons for his disciplinary charge, confinement to PRSH, and deprivation of property.

A.  **Placement of Purchase Order**

The record indicates that Mr. Abdul submitted a completed purchase request and a signed request for remittance by May 6. *See* dkt. 73-5. His order was first filed on the docket on May 14, and it was filed then by the defendants. *See* dkt. 73. And it appears that Mr. Peterson did not finally transmit an order to the vendor until May 20.

The parties' presentations at the May 21 hearing show a dispute regarding the reason for the delay. Counsel for the defendants reviewed Mr. Abdul's submissions and noted that he initially requested some items not permitted under the terms of the injunction and also provided an inaccurate mailing address for his selected vendor, delaying final transmission of the order.[1] Mr. Abdul contended that he presented a properly addressed envelope for his order and that he was prevented from filing his order with the Court sooner because a lockdown and then his confinement to PRSH prevented him from accessing the law library.

B.  **Disciplinary Charge by Mr. Peterson**

The issue of the defendants' compliance with the Court's injunction was compounded by Mr. Abdul's being charged with a disciplinary infraction and then confined to PRSH while he awaited his disciplinary hearing. Mr. Peterson set the disciplinary proceeding in motion when he issued the following conduct report on May 3:

> At approximately 4:40 pm on Friday May 3, I Chaplain Peterson, was escorting Offender F. Smith[2] 955755 back to his housing unit from the chapel. We had been attempting to work out a compromise on his most recent court settlement. During our conversation in route back he mentioned he may have another law suite [sic] in process, he just has not filed it yet. I asked him what it was for. He said he had two bottles of prayer oil in that bag as well as other items that he lost. I asked him, what bag. He said the bag he lost when your wife decided to throughly degrade and

---

[1] No court reporter was used for the May 21 hearing, and it was not transcribed. The Court has prepared this Report using the audio record of the hearing and will make a copy of that record available to either party upon request.

[2] Mr. Abdul is known within the IDOC as Francis Smith.

3

> humiliate me because of my religious practice. I said yes I remember that incident, your property was in the wrong place. Smith says he has witness statements from staff and offenders that felt sorry for him because of the way he was humiliated because he was a Muslim. He goes on to say that we can make this go away if I allow the group to have two prayer meetings per day Monday through Friday and allow them to order food twice a year for their religious feasts and have halal hygiene items. I told him I do not have the authority to make that happen. He says, you're the chaplain, if you say this is what we are doing they are going to go along with it. About this time we were getting close to JSH and his attittude changed and he went into his housing unit.

Dkt. 73-6.

Mr. Peterson's conduct report asserted that Mr. Abdul violated Code B-213, "Threatening."

*Id.* An inmate violates Code B-213 by:

1. Communicating to another person a plan to physically harm, harass or intimidate that person or someone else.

2. Communicating a plan to cause damage to or loss of that person's or another person's property.

3. Communicating a plan to intentionally make an accusation that he/she knows is untrue or false[.]

IDOC, *Adult Disciplinary Process, App'x I: Offenses*, § 213 (June 4, 2018), avail. at https://www.in.gov/idoc/3265.htm.

At the May 21 hearing, the Magistrate Judge questioned Mr. Peterson about the events that gave rise to the conduct report and why he found that Mr. Abdul's interaction with him amounted to "threatening."

Mr. Peterson testified that his discussion with Mr. Abdul on May 3 stemmed from an interaction Mr. Abdul had a couple years ago with another prison employee, Ms. Stamper, who is now married to Mr. Peterson. According to Mr. Peterson, Mr. Abdul was working at his job in the prison's kitchen. Ms. Stamper determined that some of Mr. Abdul's personal property was too close to the food-service line, confronted him, and confiscated the property. The confiscated

4

materials included religious articles, and the manner in which Ms. Stamper confronted Mr. Abdul upset him.

Mr. Peterson testified that he learned of this incident almost immediately after it happened and that he knew it was upsetting to Mr. Abdul. Mr. Peterson knew this because Ms. Stamper called him later on the day of the incident, stated that she felt she did not handle the incident well, and sought advice from Mr. Peterson on how to better interact with Muslim inmates. Mr. Peterson acknowledged in his testimony that he had discussed this incident with Mr. Abdul before May 3.

When asked how Mr. Abdul violated the Code B-213, Mr. Peterson stated unequivocally that he determined that Mr. Abdul violated the third provision by communicating a plan to intentionally make an accusation he knew to be untrue or false. The Magistrate Judge asked Mr. Peterson four times at the hearing what portion of Mr. Abdul's statement he believed Mr. Abdul knew to be false or untrue. He could not identify one. Mr. Peterson stated that he believed Mr. Abdul's statement was based on the incorrect premise that Mr. Peterson had authority to grant the requests Abdul was making. But Mr. Peterson conceded that the allegations Mr. Abdul raised as to Ms. Stamper were based on an incident that actually took place and that he knew was upsetting to Mr. Abdul; they were not allegations that Mr. Abdul knew to be false or untrue. Mr. Peterson stated unambiguously that, after his exchange with Mr. Abdul, he reviewed the various provisions of the disciplinary code and determined that "threatening" was the closest fit.

**C. Placement in PRSH**

On May 8, Sarah Napper "screened" Mr. Peterson's conduct report and issued notice of the charge to Mr. Abdul. Dkt. 84-9. The following day, Mr. Abdul was moved from his cell in the general population to PRSH. Dkts. 84-1, 84-2, 84-3.

5

Published IDOC policy states that an inmate's assignment to PRSH must be approved in writing by the shift supervisor or a higher authority and documented on State Form 39588, "Restrictive Status Housing Report." *See* IDOC Policy 02-04-101, *The Disciplinary Code for Adult Offenders*, at § VI (June 1, 2015), avail. at https://www.in.gov/idoc/3265.htm. The *Disciplinary Code* also requires that the Warden or his or her designee review that report within 72 hours. *Id.* This policy permits placement in PRSH only "if the offender's continued presence in the population poses a threat to self, others, property, or the security of the facility or program." *Id.* This determination must be based on consideration of factors such as the inmate's aggressiveness, the threat he poses to safety and security, the need to restrict the inmate's access to the general population for his own protection or to permit the completion of an investigation, and the seriousness of the alleged offense. *Id.*

At the show-cause hearing, the Magistrate Judge sought evidence of the prison staff's determination whether Mr. Abdul posed a security threat. Neither defense counsel nor Ms. Napper could provide any. Following the hearing, the Magistrate Judge ordered the defendants to produce all documentation of the basis for Mr. Abdul's confinement to PRSH, including the State Form 39588. Again, none was provided.

Instead, the information presented at the hearing indicates that the inmates charged with threatening at PCF are reflexively confined to PRSH without the individualized determination called for in the disciplinary code. Defense counsel explained that, "whenever there is threatening staff, the person is put in prehearing restrictive status housing. That's the procedure." In fact, Mr. Abdul "should have been put in immediately and was not. So when it was found out, the omission was corrected." Ms. Napper echoed defense counsel's report, testifying that it is the prison staff's "procedure that, for Code 213, that they would go on restrictive housing for prehearing."

6

**D.    Deprivation of Property in PRSH**

When Mr. Abdul was moved to PRSH on May 9, he was separated from the personal property he maintained in his cell in the general population. This included articles he would use in religious practices associated with observing Ramadan, including prayer beads and oils, books, a prayer rug, and garments. To be clear, these are articles Mr. Abdul had before the Court issued its injunction—not articles he ordered following the Court's issuance of the injunction.

At the May 21 hearing, defense counsel reported that Mr. Abdul's personal property was in a property storage room at the prison. Mr. Abdul reported that a member of the prison staff obtained a prayer rug and a kufi from that property and brought it to him on May 20. The rest of his property remained in the storage room as of May 21.

When asked why Mr. Abdul had not been provided all his personal property yet, defense counsel stated that PCF procedures require the prison staff to search and then inventory an inmate's personal property before giving it to him in PRSH and affords the staff 14 business days to do so. Defense counsel cited PCF Operational Procedure 02-01-101, *Offender Property*, as the origin of this procedure.

Operational Procedure 02-01-101 does state that the prison's "Property Officer will have fourteen (14) business days . . . to complete the inventory and return allowed property to an offender." Dkt. 86-8 at § IV. But the section in which this passage appears is labeled "Receipt and Inventory of Property *Received at a Department Facility*." *Id.* (emphasis added). It begins, "*When transferred*, all property . . . shall accompany the offender, except in an emergency situation. Prior to the transfer of an offender, *the sending facility* shall inventory and box an offender's personal property." *Id.* (emphasis added). It continues, "*Upon arrival at the Pendleton Correctional*

7

*Facility*, the offender's property and money, if any, shall be inventoried by the Offender Property Room Officer." *Id.* (emphasis added).

Even a cursory reading of Operational Procedure 02-01-101, § IV, makes clear that it concerns the prison staff's handling of an inmate's property upon his arrival at PCF from another prison—not upon his movement from one unit to another inside PCF. When asked to explain this apparent inconsistency at the May 21 hearing, defense counsel stated, "Id have to read the entire procedure, your honor. I have no idea." The Magistrate Judge has read the entire procedure, and none of its provisions appear to concern inmates moved with in PCF from the general population to PRSH. When the Court asked why some of Mr. Abdul's property had been returned to him but the rest remained in the storage room, defense counsel answered, "I did not inquire."

Published IDOC policy states that inmates confined to disciplinary restrictive status housing "shall" be permitted to have approved religious materials. IDOC Policy 02-04-102, *Disciplinary Restrictive Status Housing*, at § VIII(C)(4) (Jan. 1, 2018). Access to religious material "may be restricted if reasonably determined to be a threat to the safety and security of the facility." *Id.* A comparable policy applies to inmates confined to administrative restrictive status housing. *See* IDOC Policy 02-01-111, *Administrative Restrictive Status Housing*, at § IX(C) (Dec. 1, 2017) ("Religious property may be restricted per Policy and Administrative Procedure 02-01-101 if the property is determined to be a specific safety and security risk to the facility.").

No evidence in the record indicates that any PCF official ever determined that safety or security would be threatened by allowing Mr. Abdul to access his religious property in PRSH. When confronted with these policies at the May 21 hearing and asked whether Mr. Abdul should be permitted to access all his religious property absent such a determination, defense counsel, who

8

is a very experienced Deputy Attorney General, answered, "I didn't read all the procedures. I don't know."

### E. Conclusion of Disciplinary Proceeding

Mr. Abdul's disciplinary charge was resolved, and his property was returned to him, on May 22, the day after the show-cause hearing. Mr. Abdul was found guilty of threatening following a disciplinary hearing. *See* dkt. 84-9 at 1. The hearing officer issued a written reprimand and sentenced Mr. Abdul to time already served in PRSH. *Id.* The hearing officer did not assess any of the other sanctions—such as a loss of earned credit time, a reduction in credit class, or a restriction of privileges—that may be assessed for Class B offenses. *See Disciplinary Code for Adult Offenders* at § IX(E)(3)(e).

Following the disciplinary proceeding, Mr. Abdul's classification was changed from "CAB Hold" to "Idle No Pay." Dkt. 84-8. The Magistrate Judge understands this to mean that Mr. Abdul will not be eligible to work at a prison job (or receive the pay that would come with it) while he is on this status. *See* IDOC Policy No. 02-01-106, *Offender Work Assignments and Pay Schedule*, § III(J) (June 1, 2017), avail. at https://www.in.gov/idoc/3265.htm (defining "idle" as "[a] classification status in which an offender does not have an assignment in a treatment or offender self-help program, educational program, facility operational position, or employment due to the offender's refusal to participate, previous termination from an offender assignment, or due to offender's ineligibility for an assignment because of the offender's conduct").

Following the disciplinary hearing on May 22, Mr. Abdul also was released from PRSH and returned to a cell in the general population. *See* dkt. 84-1. His property was inventoried on May 21 and returned to him on May 22 upon his release from PRSH. *See* dkts. 83-2, 83-3.

## II. Legal Standard

"The power to punish for contempts is inherent in all courts." *Ex parte Robinson*, 86 U.S. 505, 510 (1873). The contempt power "is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *Id.* This inherent power has been further defined by statute, which authorizes a court to "punish by fine or imprisonment, or both . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3).

Case law cautions that a court should not exercise its contempt power lightly. "Before holding a person in civil contempt, a district court 'must be able to point to a decree from the court which sets forth in specific detail an unequivocal command which the party in contempt violated.'" *Trade Well Intern. v. United Cent. Bank*, 778 F.3d 620, 626 (7th Cir. 2015) (quoting *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 591 (7th Cir. 2008)). A finding of contempt must be supported "by clear and convincing evidence that (1) the district court's order set forth an unambiguous command; (2) [the alleged contemnor] violated that command; (3) the violation was significant, meaning that [the alleged contemnor] did not substantially comply with the court order; and (4) [the alleged contemnor] failed to make a reasonable and diligent effort to comply." *Ohr ex rel. NLRB v. Latino Exp., Inc.*, 776 F.3d 469, 474 (7th Cir. 2015). "'The district court does not . . . ordinarily have to find that the violation was "willful" and may find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered.'" *F.T.C. v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009) (quoting *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995)).

### III. Analysis

The facts set out in Part I of this Entry are dismaying. At worst, they portray a vindictive prison staff dead set on preventing an inmate from exercising fundamental rights guaranteed by the Constitution and enforced by an order of this Court. At best, they reveal widespread ignorance to prisoners' rights and the procedures the IDOC has put in place to insure them.

The demanding standards for civil contempt sanctions foreclose further action by the Court in this action. But this result should not be viewed as an indication that similar actions will go without consequence in the future.

**A.      Purchase Orders**

As to the placement of Mr. Abdul's purchase orders, the unambiguous terms of the Court's injunction were as follow:

> Mr. Abdul shall file copies of such purchase requests with the Court. Defendants Peterson and Liebel shall have two business days from the filing of each request to either (a) file notice that either the order has been placed with the appropriate vendor, or (b) show cause why the request does not fall within the scope of this order and need not be fulfilled.

Dkt. 67 at § IV. Mr. Abdul would initiate purchases by presenting written requests to Mr. Peterson, Mr. Liebel, or their designee, and then filing them with the Court. Within two business days of Mr. Abdul's filings, the defendants were obligated to either file notice that the orders had been placed or show cause why the orders fell beyond the scope of the injunction. *See id.*

Defense counsel has repeatedly—and correctly—noted that the defendants' obligation was to act on Mr. Abdul's purchase orders within two business days after he filed them with the Court. Mr. Abdul did not file his requests with the Court as directed by the injunction. As such, the Magistrate Judge cannot find that the defendants' failure to act violated an unambiguous command from the Court. *See Ohr*, 776 F.3d at 474.

To be clear, the defendants' approach to facilitating Mr. Abdul's purchase orders inarguably violated the *spirit* of the injunction as this Magistrate Judge understands it. The injunction created a vehicle for Mr. Abdul to obtain materials he required to observe Ramadan, which began May 5. The time-sensitive nature of the relief provided by the injunction should have been self-evident. In case it was not, the Court made the urgency abundantly clear in setting the briefing schedule for Mr. Abdul's motion for preliminary injunction.[3] Mr. Abdul's order was not finally placed until May 20, halfway through the month, and it is not clear when Mr. Abdul received the items he ordered. The defendants attribute this delay to inaction and mistakes by Mr. Abdul, and he may bear some responsibility for the late placement of his order. But the evidence shows inexplicable delays by the defendants as well. For example, Mr. Abdul signed a request for remittance on May 6. *See* dkt. 73-5. At the May 21 hearing, defense counsel reported that the request for remittance was not signed by an appropriate prison official until May 14. In other words, Mr. Abdul spent a quarter of Ramadan just waiting for a remittance slip to be signed.

To issue contempt sanctions, though, the Court must find by clear and convincing evidence that the defendants violated the *letter* of the injunction. Because Mr. Abdul never filed copies of his orders as directed by the injunction, no such finding is possible in this case.

**B.    Disciplinary Charge, PRSH, and Deprivation of Property**

The same outcome applies to Mr. Abdul's disciplinary charge, his confinement to PRSH, and his deprivation of property. The record strongly suggests that Mr. Peterson and his colleagues took these actions, not out of an honest belief that an infraction had occurred, but instead to prevent Mr. Abdul from exercising the rights protected by the injunction, in retaliation for his pursuit of

---

[3] *See* dkt. 52 at 1 ("As to issues related to accommodations for Ramadan, the defendants shall have **through April 5, 2019**, to respond to the motion, and Mr. Abdul shall have **through April 15, 2019**, to file any reply. The Court understands that Ramadan begins the evening of May 5. Therefore, **neither party should expect the Court to modify these deadlines**.") (emphasis in original).

the injunction, or both. But there is not clear and convincing evidence establishing that they violated an unambiguous order from the Court, and that is the threshold for contempt.

Mr. Peterson issued his conduct report three days after the Court entered its injunction and the same day he began working with Mr. Abdul to facilitate his purchase order. At the May 21 hearing, Mr. Peterson could not articulate a basis for his charge that Mr. Abdul threatened him. Mr. Peterson testified that he settled on a threatening charge because he reviewed the disciplinary code and determined that "threatening" was the closest fit. But he knew—and admitted at the May 21 hearing—that the allegations Mr. Abdul said he would pursue were not allegations that Mr. Abdul knew to be false or untrue.

Mr. Peterson did not direct that Mr. Abdul be confined to PRSH without his religious property, but the evidence presented at the May 21 hearing supports an inference that he knew that would be the result of his charge. Defense counsel and Ms. Napper both stated plainly on May 21 that standard practice at PCF calls for any inmate charged with threatening to be placed in PRSH. And defense counsel made clear that, in practice, an inmate moved to PRSH will be deprived of his personal property for up to 14 business days while it is "searched and inventoried." Even the most sedate imagination could infer that Mr. Peterson levied his disciplinary charge in bad faith because he knew that, as a matter of facility practice, Mr. Abdul would be placed in PRSH, denied access to his property, and thereby prevented from observing Ramadan.

Mr. Abdul's subsequent reclassification to "Idle—No Pay" status only strengthens this conclusion. This change will directly affect Mr. Abdul's income and therefore his ability to purchase religious and other items through the commissary.

The evidence before the Court strongly suggests that Mr. Peterson, motivated by vengeance or the prospect of preventing Mr. Abdul from realizing his injunctive relief, charged

Mr. Abdul with a disciplinary charge he knew to be unfounded. The evidence strongly suggests that Mr. Peterson did so because he knew his colleagues would confine Mr. Abdul to PRSH, separate him from his religious articles during Ramadan, and then prevent him from earning the funds he uses to purchase halal foods and religious articles.

This evidence may well support claims against Mr. Peterson and his colleagues in a separate action, but it does not establish clearly and convincingly that they violated an unambiguous order from the Court. The Court may not use a civil contempt order for the purpose of deterring future misconduct, but the Magistrate Judge will attempt to do so with two final notes.

### C. Prison Staff's Widespread Disregard for Inmates' Rights

First, this inquiry has reflected poorly on the defendants and their colleagues at PCF. If nothing else, the contempt inquiry has exposed a broad lack of awareness of and consideration for inmates' rights and the procedures the IDOC itself has implemented to ensure that those rights are not routinely and arbitrarily breached. The notion that prison staff must determine and document a security threat before placing the inmate in PRSH or depriving him of property appeared foreign to defense counsel and the defense witnesses present on May 21. The prison staff did not undertake these inquiries with respect to Mr. Abdul, and the testimony presented indicates that they are neglected as a matter of practice.

For purposes of the contempt inquiry, the prison staff's failure to afford basic process to Mr. Abdul before depriving him of liberty and property did not enhance anyone's liability. That may not always be the case. The contempt standard is far more onerous than the standard to state—or even prevail upon—an actionable civil rights claim. As the Magistrate Judge noted at the outset of the May 21 hearing, whether the prison staff violated Mr. Abdul's rights by retaliating against him is not the subject of this inquiry or any claim pending in this case. But this does not foreclose

the possibility that such questions will arise in future litigation by Mr. Abdul or other, similarly treated inmates.

**D.      Defense Counsel's Preparation**

Second, this inquiry has reflected poorly on defense counsel. During the May 16 hearing, defense counsel was unable to answer the basic—and obviously relevant—question of whether prison regulations prohibited Mr. Abdul from possessing religious articles in PRSH. *See* dkt. 78 at 1. The Magistrate Judge specifically instructed the defendants to be prepared to provide this information at the May 21 hearing. *See id.* at 2. But defense counsel stated on May 21 that he still could not answer that question because he "didn't read all the procedures." He relied on PCF's operational procedural regarding property of inmates who transfer into the facility, then admitted he had not read all of that policy. When asked why some of Mr. Abdul's property had been returned to him but the rest remained in the storage room, defense counsel answered, "I did not inquire."

Each of these responses should stir butterflies in the stomach of any attorney familiar with the duty of diligence. That they were all uttered in the same hearing, by the same attorney, after the Magistrate Judge specifically told counsel what to expect is unbelievable.

Defense counsel was not responsible for processing Mr. Abdul's purchase orders, charging him with a disciplinary infraction, or confining him to PRSH without his religious property. But he was responsible for providing the Court with information about those incidents and the justifications for them. Counsel's failure to treat that responsibility more seriously required the Magistrate Judge to convene two hearings and complicated the resolution of this matter. The Magistrate Judge knows defense counsel to be a skilled and reputable litigator and expects him to approach the remainder of the action with the diligence it requires.

## IV. Recommendation

For the reasons set forth above, the Magistrate Judge **recommends** that Mr. Abdul's motion for an order to compel, dkt. 71, be **DENIED**.

Dated: 26 JUL 2019

_Mark J. Dinsmore_
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

MUFTI ABDUL EL-MALIK BEY ALI
955755
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

David A. Arthur
INDIANA ATTORNEY GENERAL
David.Arthur@atg.in.gov

Jonathan Paul Nagy
INDIANA ATTORNEY GENERAL
jonathan.nagy@atg.in.gov